UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SOUTHERN HOME CARE SERVICES,  :
INC.,                         :
                              :
     Plaintiff,               :
                              :
v.                            :   Case No. 3:13-CV-00792 (RNC)
                              :
VISITING NURSE SERVICES, INC. :
OF SOUTHERN CONNECTICUT,      :
MAURICE BUNNELL, AND          :
RHONDA MARSHALL,              :
                              :
     Defendants.              :
                              :

RULING AND ORDER

Plaintiff Southern Home Care Services, Inc. ("ResCare")
brings this diversity case against two of its former employees,
Maurice Bunnell and Rhonda Marshall, and their current employer,
Visiting Nurse Services, Inc. of Southern Connecticut ("VNS"),
alleging that Bunnell and Marshall have improperly solicited its
clients and used its confidential information in connection with
their new employment at VNS.  The defendants have moved for
summary judgment.  For reasons that follow, I conclude that VNS
and Bunnell are entitled to summary judgment on all the claims in
the complaint, and that Marshall is entitled to partial summary
judgment.

I. Background

The summary judgment record, viewed most favorably to
ResCare, shows the following.  ResCare provides in-home nursing

1

services to patients suffering from physical and mental disabilities.  It competes with defendant VNS.  ECF No. 109, at ¶¶ 11-13.  Defendants Bunnell and Marshall began working at ResCare in July 2010.[1]  Each was engaged as a nurse case manager responsible for visiting psychiatric patients in their homes.  In March 2013, they began to think about leaving ResCare.  On March 25, they met with VNS managers but did not accept employment.  On April 8, 2013, however, Bunnell resigned his position and took a job at VNS, and on May 3, Marshall did too.  In the ensuing weeks, many of their ResCare patients followed: seventeen of Bunnell's patients switched to VNS, as did thirty of Marshall's.  ResCare claims that it has lost $620,000 as a result of these transfers.

        At the outset of their employment at ResCare, Bunnell and Marshall signed identical non-disclosure and non-solicitation agreements.  The non-disclosure agreement stated that Bunnell and Marshall would receive confidential information, including patient lists and medical records, in the course of their employment.  They agreed not to use this information except for ResCare's benefit.  ECF No. 127-1, 127-4.  The non-solicitation agreement provided that Bunnell and Marshall must not solicit ResCare patients for the benefit of a competitor.  ECF No. 127-1,

---

[1] More accurately, they began working at a company called TotalCare, which was later acquired by ResCare.

127-4.  The parties agree that these contracts did not limit the ability of Bunnell and Marshall to work for a competitor of ResCare's following the end of their employment.  ECF No. 109, at ¶ 16.

Two points relating to the agreements merit discussion.  The first concerns the structure of the home services healthcare industry and its effect on restrictive covenants of the type at issue here.  The relationship between entities like ResCare and their patients, although in some sense a relationship between an ordinary service provider and its customers, is shaped by the influence of the patients' doctors, who are unaffiliated with the nursing agency and bear primary responsibility for making decisions about the patients' care.  For instance, the confidential information maintained by the agency – patient names, diagnoses, prognoses, pharmaceutical regimens, and the like[2] – is also possessed by the patients' doctors.[3]  ECF No. 106-4, at ¶ 42.  Doctors may disseminate such information as they deem necessary for their patients' care.[4]  Similarly, doctors play a role in determining their patients' nursing needs.  If a

---

[2]Much of this information can be found in documents called Medicare Form 485s.  The primary dispute over confidential information in the case focuses on these forms.

[3]Indeed, the doctors play a role in generating this information.

[4]Subject, of course, to statutes and regulations that protect the confidentiality of medical records.

patient's nurse leaves one agency for another, the doctor may appropriately decide that the nurse should continue to care for the patient notwithstanding the change in employment.[5]  For that reason, a nurse who is leaving an entity like ResCare and joining another may properly notify her patients' doctors of the change. ResCare concedes that doing so would not violate any of the restrictive covenants its employees sign.  ECF No. 106-4, at ¶ 46.  It is likewise proper if the doctor, having been apprised of the nurse's new employment, refers the nurse's patients to the new employer so they can remain under the care of the nurse.  ECF No. 120-1, at 66.

The second point relates to the first.  Before taking work at ResCare, Bunnell and Marshall worked for a different nursing agency called All About You Home Care.  When they moved to ResCare, so did many of their patients.  Twenty of Bunnell's patients, and ten of Marshall's, followed them to ResCare.  ECF No. 106-4, at ¶¶ 6-7.  ResCare acknowledges that patient transfers are common and states that so long as a patient's doctor makes a bona fide referral to a new nursing agency, nothing prevents the agency from accepting the patient.  Id. at ¶¶ 40-41.

ResCare contends that Bunnell, Marshall and VNS have engaged

_____

[5]Psychiatric patients can develop strong attachments to their nurses, and maintaining continuity of care can have a salutary effect on treatment.  ECF No. 106-4, at 36.

4

in the following improprieties:

- ResCare says that its employees spoke with Bunnell's and Marshall's patients after their resignations. Some patients reported that Bunnell had offered them bonuses in exchange for switching agencies. Others said that Marshall had switched their care to VNS without their knowledge or that she had untruthfully reported that ResCare was simply changing its name to VNS. ECF No. 125, at 8; ECF No. 9, at ¶ 3; ECF No. 120-2, at 231-32.
- Bunnell's cell phone records show that he called three of his ResCare patients on April 8 and 9. Within a day or two, all three patients switched to VNS. ECF No. 127-7.
- Prior to resigning, Marshall urged another ResCare nurse, Tamika Miller, to move to VNS. ECF No. 127-11. Miller stayed at ResCare.
- Shortly before leaving ResCare, Bunnell requested that his supervisor provide him with the Form 485s of all his patients. This request was unusual. Bunnell generally requested a patient's Form 485 only if it needed to be updated (which occurred every sixty days). Bunnell told his supervisor he wanted the forms so he could get started on preparing updates. Bunnell never returned the forms, which also was unusual. As a general matter, outdated Form 485s were returned to ResCare to be destroyed. ECF No. 127-3.
- In late April 2013, ResCare received a mailing from a Dr. Scott Woods. Dr. Woods cared for G.O., a patient of Bunnell's. The mailing to ResCare contained G.O.'s Form 485, a document originally generated by ResCare. The Form 485 was date-stamped and indicated that on April 23, 2013, VNS had faxed it from its office to Dr. Woods. ECF No. 120-1, at 102. The document had, therefore, somehow found its way into VNS's possession, even though ResCare had created it. According to ResCare, this shows that Bunnell took confidential information (Form 485s) with him when he left ResCare and shared it with VNS.

On May 6, 2013, having learned of this behavior, ResCare sent cease-and-desist letters to Bunnell, Marshall and VNS. After that time no more patients of Bunnell's transferred to VNS, but eleven of Marshall's patients did.

On this basis ResCare asserts five claims:

- Count One, Breach of Contract (Bunnell and Marshall): ResCare asserts that Bunnell and Marshall breached the non-disclosure and non-solicitation provisions in their restrictive covenants.
- Count Two, Misappropriation of Trade Secrets (Bunnell, Marshall and VNS): ResCare asserts that all defendants wrongfully obtained and used its confidential patient information.
- Count Three, Tortious Interference with Contractual Relations (VNS): ResCare asserts that VNS intentionally interfered with the non-disclosure and non-solicitation agreements between ResCare and the individual defendants.
- Count Four, Tortious Interference with Business Relations (Bunnell, Marshall and VNS): ResCare asserts that all defendants intentionally interfered with the business relationships that existed between ResCare and the individual defendants' patients.
- Count Five, Violation of the Connecticut Unfair Trade Practices Act (CUTPA) (Bunnell, Marshall and VNS): ResCare asserts that the defendants' actions were unfair, oppressive and unscrupulous, in violation of CUTPA.

## II. Discussion

The Court's role on a motion for summary judgment is to determine whether the record presents a triable issue of fact. Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is a fact that influences the case's outcome under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" dispute is one that a reasonable jury could resolve in favor of the non-movant. Id. A court considering a motion for

summary judgment must view the record in the light most favorable to the party opposing the motion, resolving factual disputes and drawing all reasonable inferences in the nonmovant's favor. Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

A. Breach of Contract

To recover for breach of contract, ResCare must show "the formation of an agreement, performance by one party, [and] breach of the agreement by the other party." Bouchard v. Sundberg, 80 Conn. App. 180, 189 (2003).  There is no question that Bunnell and Marshall were subject to enforceable non-disclosure and non-solicitation agreements.  The issue is whether ResCare can point to evidence permitting the reasonable inference that they breached their contracts.  ResCare's claim survives, just barely, with respect to Marshall, but fails with respect to Bunnell.

1. Marshall

There is no evidence that Marshall breached the non-disclosure agreement but ResCare does offer evidence that she violated her non-solicitation agreement.  ResCare employee Ray Pantalena has testified that several patients told a different ResCare employee, Andrea Bunnell, that Marshall switched their care to VNS while leading them to believe ResCare was still providing their services.  ECF No. 120-2, at 231–32.  And Miller has stated that patients told her the same thing.  ECF No. 8.

VNS argues that the patients' statements are inadmissible
hearsay.  ResCare acknowledges that the statements are hearsay
but argues they are admissible either as statements relating to
medical treatment, <u>see</u> Fed. R. Evid. 803(4), or under the
residual exception to the rule against hearsay, <u>see</u> Fed. R. Evid.
807.  I conclude that neither exception applies.

The patients' statements do not fit within Rule 803(4)'s
exception for "statement[s] made for medical diagnosis or
treatment."  This exception permits the admission of hearsay if a
statement: "(A) is made for – and is reasonably pertinent to –
medical diagnosis or treatment; and (B) describes medical
history; past or present symptoms or sensations; their inception;
or their general cause."  <u>Id.</u>  Here, the patients' statements
seem to have been made when ResCare employees, concerned that
Marshall was poaching, undertook to question the patients about
her conduct.  The patients were providing information pertinent
to a business dispute in response to questioning, not "describing
[their] medical history," "symptoms," or "sensations" to obtain
"medical diagnosis or treatment."  <u>Id.</u>  Nothing suggests the
patients thought they were making statements that would affect
the medical care they received, and the statements are not of the
type relied on by physicians in diagnosis and treatment.  <u>Iron
Shell</u>, 633 F.2d at 84.  The cases ResCare offers to support its
argument fall well within the Rule's heartland and serve only to

highlight the difference between statements made for diagnosis or treatment and the statements at issue here.  See, e.g., Messier v. United States, 962 F. Supp. 2d 389, 393-94 (D. Conn. 2013) ("In the case at bar, Plaintiff's statements to her physicians that she was holding on to a railing when the collision impact was felt is directly relevant to the doctors' medical diagnoses, since the statements enable the doctors to understand the mechanics of the injury and the forces to which Plaintiff's body was subjected.").

Nor do the statements fall within the residual exception. Under Rule 807, a hearsay statement not admissible under any of the exceptions enumerated in Rules 803 and 804 may be admitted if:

> 1) the statement has equivalent circumstantial guarantees of trustworthiness;
> 2) it is offered as evidence of a material fact;
> 3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> 4) admitting it will best serve the purposes of the[] rules and the interests of justice.

Fed. R. Evid. 807(a).  The Second Circuit has cautioned that the residual exception applies "very rarely, and only in exceptional circumstances."  Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991).  The circumstances here are not exceptional. ResCare argues that "the statements came from patients with no motivation for insincerity," ECF No. 127, at 14, but insincerity is not the only evil the hearsay rules address.  Excluding

hearsay also guards against faults in the declarant's perception, memory and narration.  Schering Corp. v. Pfizer Inc., 189 F.3d 218, 232-33 (2d Cir. 1999).  Nothing suggests the patients in this case are better perceivers, recallers and narrators than the ordinary hearsay declarant.[6]  Moreover, they gave their statements while being interviewed by questioners who had a stake in the answers.  Given the patients' mental condition and the possibility that their statements were influenced by the power of suggestion, the statements are not unusually reliable.  In addition, this evidence is not more probative on the point for which it is offered than other evidence that could be obtained through reasonable efforts.  ResCare argues that these statements are more probative than "the self-serving and conflicting testimony of Bunnell and Marshall."  ECF No. 127, at 14.  Perhaps, but they are not more probative than sworn testimony of the patients themselves, and there is no indication that the patients were unavailable for depositions in this case.  Accordingly, the patients' statements are not admissible.

In addition to the patients' statements, ResCare relies on an affidavit by Tamika Miller stating that Marshall tried to induce her to leave ResCare.  ECF No. 127-11.  Defendants assume this evidence can support a finding that Marshall thereby

---

[6] As defendants point out, the declarants are "unnamed patients suffering from mental illnesses including paranoid schizophrenia and auditory hallucinations."  ECF No. 135, at 4.

breached her non-solicitation agreement.  <u>See</u> ECF No. 135, at 7.
They contend, however, that the breach is not actionable because
it caused no harm: Miller did not leave ResCare.

Defendants correctly note that it is ResCare's obligation to
prove actual damages if it wishes to obtain them, and ResCare has
not done so.  But actual damages are not an essential element of
recovery in contract.  A non-breaching party is entitled to
recover nominal damages even if it is unable to prove it was
actually harmed.  <u>Lydall, Inc. v. Ruschmeyer</u>, 282 Conn. 209, 254
(2007) ("Lydall presented no evidence and made no arguments in
support of its claim for damages at trial but, rather, conceded
that it could point to no pecuniary damages. . . . [H]owever, we
also conclude that Lydall is entitled to nominal damages of $1
under its breach of contract claim."); <u>News America Marketing in-
Store, Inc. v. Marquis</u>, 86 Conn. App. 527, 535 (2004), <u>aff'd</u>, 276
Conn. 310 (2005) ("[I]f a party has suffered no demonstrable harm
. . . that party may be entitled . . . to nominal damages for
breach of contract."); <u>Restatement (Second) Contracts</u> § 346 cmt.
(1981) ("Although a breach of contract by a party against whom it
is enforceable always gives rise to a claim for damages, there
are instances in which the breach causes no loss. . . . In [this]
instance[] the injured party will nevertheless get judgment for
nominal damages, a small sum usually fixed by judicial practice
in the jurisdiction in which the action is brought.").

Accordingly, Marshall is entitled to summary judgment on the question of actual damages, but she is not entitled to summary judgment as to count one in its entirety.

2. Bunnell

ResCare's claim that Bunnell breached his non-solicitation and non-disclosure agreements rests on the following evidence: (1) some patients reported that Bunnell offered them bonuses for switching agencies; (2) in the days after he resigned from ResCare, Bunnell contacted three of his patients, all of whom soon switched to VNS; (3) shortly before leaving ResCare, Bunnell requested Form 485s for his patients and never returned them; and (4) a Form 485 generated by ResCare for one of Bunnell's patients, referred to as G.O., was in VNS's possession at some point in April 2013. Each of these items of evidence is discussed in more detail below.

a. Non-Solicitation

*Bunnell's offer to pay patients bonuses.*  The evidence of Bunnell's offers to patients takes the form of testimony by ResCare employees who took statements from the patients themselves.  See ECF No. 9, at ¶ 3; ECF No. 120-2, at 231–32. This evidence is inadmissible for the same reasons that the evidence of patient statements offered against Marshall is inadmissible.

*Bunnell's phone records.*  ResCare employee Tina Vanacore has

submitted an affidavit stating that Bunnell spoke with the
following patients (referred to here by their initials) at the
following times:

- J.S.: April 8, 2013, at 3:31 p.m.
- M.L.: April 9, 2013, at 7:10 a.m.
- R.B.: April 9, 2013, at 9:17 a.m.

These conversations occurred within a day of Bunnell's leaving
ResCare, and each of the patients left ResCare for VNS shortly
thereafter.  Bunnell does not dispute this account.  Instead he
points to the phone records on which the Vanacore affidavit is
based.  They reveal that in all three instances mentioned above,
Bunnell had a telephone conversation with the patient's clinician
before speaking with the patient:

- Bunnell spoke with BH Care, which employs J.S.'s
  clinician, three times on April 8.  Each call occurred
  before Bunnell spoke with J.S.  ECF No. 135-3, at 3.
- Bunnell spoke with CMHC, which employs M.L.'s
  clinician, numerous times on April 9 before speaking
  with M.L.  Id. at 3-4.
- Bunnell spoke with Cornell Scott Hill-Health Center,
  which employs R.B.'s clinician, three times on April 8,
  before speaking with R.B. on April 9.  Id. at 3.

Bunnell has provided an affidavit stating that during the
calls with the clinicians, he told them he was moving to VNS.
The clinicians then ordered him to continue caring for the
patients and in each case transferred the patients' care on April
9.[7]  Accordingly, he says, the calls do not provide a basis for

_____

[7]This testimony is corroborated by the patients' VNS intake
forms.  Each lists an "Ordering Physician" and gives an "Initial
Inquiry Date" of April 9.  See ECF No. 135-3, at 6-8.

concluding that he breached the non-solicitation agreement.

I agree.  To be sure, a juror would not have to believe Bunnell's affidavit.  <u>See Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000).  But the affidavit describes a course of conduct that the parties agree is permissible (that is, Bunnell's informing clinicians of his change of employment and the clinicians' subsequently referring their patients).  If ResCare can point to evidence supporting the reasonable conclusion that its own narrative is more likely than the one provided by Bunnell's affidavit, its claim against him should go to a jury.  But do Bunnell's phone records support the reasonable conclusion that he more likely than not violated the non-solicitation agreement?

They do not.  Bunnell's phone records are consistent with the hypothesis that he improperly solicited patients without first receiving orders from their clinicians to continue care.[8] But they are at least equally consistent with the hypothesis that he contacted his patients only after their doctors told him he should.  In other words, the evidence shows exactly what one would expect it to show if Bunnell had behaved entirely appropriately.  A plaintiff must come forward with more to reach

---

[8]Given that the Court has no evidence outside of Bunnell's affidavit about what was said in the conversations, it is possible the doctors in fact told him not to continue caring for his patients.

14

a jury.

This situation is comparable to that in <u>Bell Atl. Corp. v.</u> <u>Twombly</u>, 550 U.S. 544, 569-70 (2007).  There, plaintiffs argued that the defendant telecommunications providers' parallel conduct was consistent with an antitrust violation, but the Court determined that it was also consistent with innocent conduct:

> [T]he plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." . . . In a traditionally unregulated industry with low barriers to entry sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation.  In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword.  Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing. . . . Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

<u>Twombly</u>, 550 U.S. at 569-70; <u>see also Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

Here, as in <u>Twombly</u>, there is a ready "natural explanation" for the evidence, and nothing in the record suggests that that explanation is not the correct one.  Just as allegations perfectly consistent with innocent conduct cannot survive a

12(b)(6) motion, facts perfectly consistent with innocent conduct
cannot create jury issues.  If a jury returned a verdict for
ResCare on this record, the Court would have to set it aside as
the product of mere speculation rather than reasoned inference.[9]
Accordingly, Bunnell is entitled to summary judgment on the claim
that he breached the non-solicitation agreement.

b. Non-Disclosure

*The Form 485s.*  ResCare contends that Bunnell breached his
non-disclosure agreement by using Form 485s in caring for his
former patients.  As discussed above, Form 485s are Medicare
forms containing information about a patient's identity, address,
diagnosis, and treatment regimen.  Nurses complete the forms,
which must be updated every sixty days.  ECF No. 127-3, at 1.  At
ResCare, when a Form 485 is due for updating, the patient's nurse
asks the medical records department for the form, makes changes
to the form as needed, and returns the marked-up form to the
records department, which produces a new form and destroys the
old one.  Id.  Like other information generated by nursing
agencies, Form 485s are shared with patients' doctors.  ECF No.
106-5 (Deposition of Ray Pantalena), at 102-03 ("We make two

---

[9]The Court notes that one source of information is
conspicuously absent from the record: testimony from the
patients' clinicians.  These individuals presumably have
firsthand knowledge about the circumstances under which patients
transferred from ResCare to VNS.  But plaintiff, which has the
burden to put forth evidence creating a triable issue of fact,
has not deposed the clinicians.

copies.  One goes into the chart, unsigned one, to have a copy.
And one goes to the doctor to be signed by the doctor.").  Once a
copy is sent to the doctor, ResCare lacks authority to prevent
the doctor from disseminating it if he or she deems it in the
patient's interest.  Id.

ResCare's claim against Bunnell based on the Form 485s
relies on two pieces of evidence.  First, shortly before Bunnell
left ResCare, he asked his supervisor for the Form 485s of all
his patients.  This request was unusual.  Bunnell generally
requested a patient's Form 485 only if it needed to be updated.
Bunnell said he wanted the forms so he could get started on
preparing updates.  Bunnell never returned the forms, which also
was unusual: ordinarily outdated Form 485s were returned to
ResCare to be destroyed.  ECF No. 127-3.[10]  Second, after Bunnell
joined VNS, Rescare received a mailing from Dr. Scott Woods, who
cared for a patient of Bunnell's named G.O.  G.O. had followed
Bunnell from ResCare to VNS.  ResCare was surprised to find that
the mailing contained one of its own Form 485s,[11] which had been

_____

[10]Bunnell's failure to return the forms may have breached his
obligation (under a separate employment contract) to return
confidential information to ResCare on termination of employment.
ResCare mentions this in passing, ECF No. 127 at 12, but has not
sought relief for any such potential breach.  The other
agreement, found at ECF No. 127-2, is not mentioned in the
complaint.

[11]Form 485s generated by ResCare nurses bear ResCare's name
and mark, which is how ResCare determined that it had created the
document.

generated for G.O. in late February 2013.  A date stamp at the top of the form showed that VNS had faxed it to Dr. Woods on April 23.  ECF No. 120-1, at 102.

According to ResCare, Bunnell's unusual request for all his patients' Form 485s supports an inference that he used the forms to treat patients after leaving for VNS.  In addition, ResCare argues, there is "no question" that "Bunnell removed the Medicare 485 form of patient G.O. from ResCare's chart, took the form to VNS, and faxed the form from VNS to the patient's physician for a signature."  ECF No. 127, at 12.  Dr. Woods then sent the document to ResCare "mistakenly" after he "saw ResCare's name and address on the form."  Id.  Bunnell's use of the Form 485, ResCare argues, breached his obligations under the non-disclosure agreement.

Bunnell urges otherwise.  The affidavit describing his request for the Form 485s (ECF No. 127-3), he points out, does not state when he took the forms – it simply says this occurred "just before" the end of his employment.  Nor does the affidavit say anything about what he did with the forms after requesting them.  With regard to the Form 485 for patient G.O., Bunnell argues, it is perfectly possible that the following occurred:

- When Bunnell left ResCare for VNS, G.O. followed. (This is undisputed.)
- VNS was thereafter responsible for G.O.'s care. (Again, undisputed.)
- VNS, however, did not have any documentation describing G.O.'s treatment regimen.

18

- It accordingly obtained G.O.'s Form 485 from Dr. Woods, who was at perfect liberty to provide it to VNS.

Defendants asked Pantalena about this scenario during his deposition.  Pantalena stated it was "possible" this had occurred.  He also stated it was "improbable," but said little about why that is so.  See ECF No. 106-5, at 105.[12]

Taken together, do the two pieces of evidence presented by ResCare permit a reasonable inference that Bunnell breached the non-disclosure agreement?  I conclude that they do not.

Starting with the evidence concerning patient G.O.'s Form 485, what does it tend to demonstrate?  As is true of the evidence relating to Bunnell's phone records, it is consistent with a theory of liability but every bit as consistent with a theory of non-liability.  On this record, it appears that if Bunnell wanted to abide by his contractual obligations, he would have obtained his patients' records after leaving ResCare.  One would also expect him to acquire the information from the one

---

[12]Pantalena was asked why he thought it was improbable Dr. Woods sent the form to VNS.  He responded: "Where is his date stamp?"  ECF No. 106-5, at 105.  I take him to be suggesting that nothing on the form indicates that Dr. Woods had faxed the form to VNS, which would apparently have produced a date stamp.  But Pantalena said nothing more on the point and did not explain why, if Dr. Woods had sent the form to VNS, it would necessarily have been by way of fax, there being numerous alternative methods of delivery (scan-and-e-mail, copy-and-FedEx, copy-and-hand-deliver) that do not produce date stamps.  Because Pantalena's explanation is so incomplete, the Court must ignore it.  See Fed. R. Evid. 701 (a lay witness may give testimony in the form of an opinion, but only if the opinion is rationally based on the witness's own perception and will help the jury).

source other than ResCare in possession of it – his patients'
physicians.  Even ResCare says it is "possible" this occurred.
Accordingly, VNS's possession of an old ResCare Form 485 shows
exactly what one would expect it to show if Bunnell had done
nothing wrong.  It being perfectly consistent with non-liability,
it cannot defeat defendants' motion for summary judgment.  <u>See</u>
<u>Twombly</u>, 550 U.S. at 569-70.

Bunnell's request for the Form 485s prior to his departure
also counts for very little.  Granted, the Court must credit
plaintiff's affidavit and assume that it was unusual for Bunnell
to make this request.  But taking confidential information is not
the same as *using* it, and ResCare is endeavoring to show use.
Though it is difficult to find precedent on point (and plaintiff
cites none), the most relevant case I have located supports this
view.  In <u>Electronic Planroom, Inc. v. McGraw-Hill Cos., Inc.</u>,
135 F. Supp. 2d 805 (E.D. Mich. 2001), the defendant employee
resigned from the plaintiff employer.  Just before his
resignation he downloaded a database of customer information and
a new software prototype.  He accepted work at a competitor.  On
the plaintiff's claim for misappropriation of trade secrets, the
court granted summary judgment in the employee's favor.  It
reasoned that "the fact that [defendant] might well have taken
trade secret information, and that he might have acquired this
information in confidence, is unavailing to [plaintiff] absent

20

evidence that [defendants] actually *used* this information." Id. at 821.  Even taking into account evidence tending to show that plaintiff's sales declined after defendant left, a conclusion that defendant used the acquired information could be the product only of "rank speculation."  Id.  "In short," the court concluded, "though [defendant] plainly put himself in a position to exploit the information he brought with him from Essential, there is absolutely nothing in the record to indicate that he actually put this information to use at [his new job]."  Id.  So too here.

The one remaining question is whether the evidence concerning G.O.'s Form 485 is sufficient in combination with Bunnell's acquisition of the Form 485s to defeat defendant's motion.  I think the answer is no.  There is something to the argument that Bunnell's evident willingness to use the Form 485s for VNS – which the Court might infer from his requesting a large number of them prior to leaving ResCare – makes it somewhat more likely that Bunnell, not Dr. Woods, provided VNS with G.O.'s Form 485.  But I am nonetheless convinced that no reasonable juror could, on the strength of that inference, find it more likely than not that Bunnell improperly used the patient records.  The evidence about G.O.'s Form 485 – being perfectly consistent with innocent conduct – does not suggest impropriety.  Combining it with whatever slight value might be assigned to the evidence of

Bunnell's acquiring the Form 485s does not provide a basis for a reasonable finding that he used the forms in violation of his agreement with ResCare.[13]

B. Misappropriation of Trade Secrets

In count two, ResCare asserts that by using confidential Form 485s in caring for new patients at VNS, Bunnell and Marshall (along with their new employer) misappropriated trade secrets.[14] A trade secret is "information, including a . . . customer list that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the

---

[13] Two points related to damages are worth noting.  First, even if the Court could infer from VNS's possession of G.O.'s Form 485 that Bunnell took the form from ResCare and used it, that would not justify the inference that Bunnell did the same thing with all the other Form 485s.  VNS would therefore be entitled to summary judgment as to the claims involving patients other than G.O., and ResCare would be permitted to collect only whatever damages it suffered through Bunnell's use of G.O.'s form.

Second, it is difficult to understand how the alleged breach of the non-disclosure agreement, as opposed to the alleged breach of the non-solicitation agreement, gave rise to any damages at all.  The parties seem to agree that VNS could properly have obtained Form 485s from Bunnell's patients' clinicians.  If these documents were readily available to VNS through legitimate channels, one wonders how its acquiring them through an alternative, illegitimate channel did ResCare any harm.

[14]ResCare names Marshall in this count but, as discussed above, there is no evidence that she used confidential information after leaving ResCare.  Accordingly, she is entitled to summary judgment on this count.

subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d). Connecticut courts look to a number of factors in determining whether information is a trade secret, including:

> 1) the extent to which the information is known outside the business and by employees and others involved in the business, 2) the measures taken by the employer to guard the secrecy of the information, 3) the information's value to the employer and to competitors, 4) the resources the employer expends in developing the information, and 5) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Roberts S. Weiss & Assocs. v. Wiederlight, 208 Conn. 525, 538 (1988). The question whether information constitutes a trade secret is generally fact-intensive. Holiday Food Co. v. Munroe, 46 A.2d 814, 817 (Conn. Super. 1981).

The parties disagree about whether the information contained in plaintiff's Form 485s is protected. Plaintiff argues with some force that it is. Defendants correctly note that the only Connecticut court to address this question ruled that patient information held by a home nursing agency was not a trade secret. See Priority Care, Inc. v. Gentiva Health Servs., No. CV044002756, 2005 Conn. Super. LEXIS 23, at *18 (Conn. Super. Jan. 7, 2005) ("By Priority Care's own admission, the patients' case managers and/or doctors were privy to information about the patients and were responsible for the patients' transfers from Priority Care to Geneva. The information Priority Care considers to be trade secrets was in actuality information provided by

third parties who were free to share such information with other home health service providers, such as Gentiva.  The court finds that because this information was available to others outside of Priority Care, it does not constitute a trade secret and, therefore, is not in violation of CUTSA.").[15]

There is no need to decide whether the information at issue qualifies for trade secret protection because no reasonable juror could conclude that the defendants engaged in misappropriation. Plaintiff having failed to adduce evidence permitting a reasonable inference that either Bunnell or Marshall wrongfully obtained confidential information from ResCare and used it at VNS, judgment will enter for the defendants on count two.

C. Intentional Interference with Contractual Relations (VNS)

In count three, ResCare asserts that VNS intentionally interfered with its contractual relationships with Bunnell and Marshall.  According to ResCare, VNS did so by accepting patient transfers and confidential information from the individual defendants, despite knowing they were contractually obligated not to solicit patients or share the information.  To prevail on this claim, plaintiff must prove that VNS knew of the existence of the relationship between the individual defendants and ResCare, and interfered with that relationship by conduct that was in fact

---

[15]The Priority Care court was determining whether plaintiff had met the standard for obtaining preliminary injunctive relief, not whether it could reach a jury.

tortious.  See Appleton v. Bd. of Educ. of Town of Stonington,
254 Conn. 205, 212-13 (2000).  VNS argues that ResCare cannot
satisfy these requirements.  I agree.

1. Interference

VNS first argues that ResCare cannot show any interference
with its contracts with Bunnell and Marshall: it cannot
demonstrate that either of them improperly solicited customers or
used confidential information.  For the reasons discussed in Part
II.A., above, VNS is correct.[16]  The tortious interference claim
against VNS is derivative of the breach of contract claim against
Bunnell and Marshall, so it too fails.

2. Knowledge

ResCare advances two separate arguments in an effort to
demonstrate that VNS had knowledge of the non-solicitation and
non-disclosure agreements.  ResCare's first argument is that a
VNS employee admitted in her deposition that such agreements are
standard in the industry.  ECF No. 121-1, at 55.  Accordingly, it
says, VNS must have known about the agreements even before it

---

[16]In Part II.A., I concluded that the breach of contract
claim against Marshall can proceed insofar as it is predicated on
her solicitation of Tamika Miller.  But (1) ResCare does not
argue that Marshall's solicitation of Miller supports a tortious
interference claim, see ECF No. 127, at 19-21; (2) Marshall
purportedly solicited Miller prior to accepting employment at
VNS, and there is no suggestion VNS knew about it, see ECF No.
127-11; and (3) proof of actual damages is an essential element
of this tort, see Appleton, 254 Conn. at 213.

hired Marshall and Bunnell.[17]  In addition, ResCare argues that
VNS knew about the contracts by early May 2013, when it received
a cease-and-desist letter.  Both arguments are unavailing.

With regard to the first argument, case law from Connecticut
– as well as from New York, which appears to treat the tort
similarly – makes it clear that liability depends on "actual
knowledge" of the "particular contractual provision" alleged to
have been violated.  Reach Music Publishing, Inc. v. Warner /
Chappell Music, Inc., No. 9 Civ. 5580 (KBF), 2014 WL 5861984, at
*10 (S.D.N.Y. Nov. 10, 2014).[18]  In Reach, for example, the
defendant knew a contract existed between the plaintiff and its
co-defendant.  But there was no evidence it had actual notice of
the specific provision with which it was alleged to have
interfered, and for that reason it escaped liability.  Id. at 11;
see also Thompson v. Rizzitelli, No. CV 10501579S, 2010 WL

---

[17]VNS says this testimony is inadmissible because its
employee is not qualified to speak as an expert on industry
practice.  But the testimony is offered to show what the employee
knew, not what industry practice actually is.  Offered for the
purpose of showing the employee's state of mind, the evidence is
unobjectionable.

[18]Other jurisdictions have explicitly held that constructive
or inquiry notice is enough.  See Major Computer Inc. v. Acad.
Life Ins. Co., 929 F.2d 1249, 1252 (8th Cir. 1991) ("It is not
necessary to prove actual knowledge.  It is enough to show that
defendant had knowledge of facts which, if followed by reasonable
inquiry, would have led to a complete disclosure of the
contractual relations and rights of the parties." (internal
quotation marks omitted)).  The Connecticut and New York
precedent appears to be uniformly the other way.

5491291, at *3 (Conn. Super. Dec. 6, 2010) (defendant's "limited knowledge" of the contract in question precluded a finding of liability); Roche Diagnostics GmbH v. Enzo Biochem, Inc., 992 F. Supp. 2d 213, 221 (S.D.N.Y. Dec. 6, 2013) ("[C]onstructive knowledge is inadequate to demonstrate [defendant's] knowledge for purposes of tortious interference."); Gallagher v. Savarese, No. 99 Civ. 4181 (LMM), 2001 WL 1382581, at *6 (S.D.N.Y. Nov. 7, 2001) (evidence of defendant's knowledge that plaintiff sometimes hired co-defendant to train him for boxing matches did not show that defendant knew plaintiff and co-defendant had entered an exclusive training contract). Under the standard requiring actual knowledge, ResCare's evidence is insufficient to create a triable issue. Given VNS's knowledge about industry practice, it might have been acting recklessly if it in fact interfered with the contracts at issue. But if the difference between recklessness and knowledge is to be taken seriously, VNS's general knowledge of the industry cannot substitute for "actual knowledge of a specific contract." Int'l Minerals & Res., Inc. v. Pappas, No. 87 Civ. 3988 (PKL), 1992 WL 354504, at *3 (S.D.N.Y. Nov. 17, 1992).

With regard to ResCare's second argument (VNS learned about the contracts by early May 2013 due to its receipt of the cease-and-desist letter), it is undisputed that all of Bunnell's patients who transferred to VNS did so prior to the cease-and-

desist letter, and there is no evidence he used confidential information after that time.  (The Form 485 VNS sent to Dr. Woods was faxed on April 23.)  Some of Marshall's patients transferred after May 6, but (1) ResCare has no admissible evidence that Marshall improperly solicited patients (as opposed to a ResCare employee), and (2) it has no evidence, admissible or otherwise, that Marshall ever used confidential information.  Accordingly, VNS's knowledge of the contracts came too late, and this element fails.

3. <u>Tortious Conduct</u>

Not every act that interferes with a contract is tortious. Rather, the defendant must act with "improper motive" or through "improper means."  <u>Robert S. Weiss & Assocs., Inc. v. Wiederlight</u>, 546 A.2d 216, 223 (1988).  Hiring an employee with knowledge that the employee is subject to a restrictive covenant is not actionable.  <u>Id</u>.  Indeed, it is not enough even to encourage the employee to act in breach of a known non-solicitation agreement or to receive confidential information from the employee knowing it ought not to be disclosed.  <u>Id</u>. ("The assertion that IAC 'encouraged' Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's terms does not fairly imply that IAC acted with fraud, misrepresentation, intimidation or molestation, or that it acted with malice." (internal quotation

28

marks omitted)); <u>Sanford Hall Agency, Inc. v. Lynne M. Dezanni et al.</u>, No. CV044000576, 2004 Conn. Super. LEXIS 3574, at *2, *21 (Conn. Super. Dec. 2, 2004) ("While the evidence shows the existence of a contract between Dezzani and the plaintiff as well as the fact that Sinclair was aware of the existence of such an employment contract, the plaintiff did not establish an intent to interfere with that relationship . . . . Sinclair hired Dezzani because it considered her a skilled professional insurance salesperson . . . . The plaintiff also did not demonstrate any malice or intentional interference on the part of Sinclair. There is no evidence on record that Sinclair required Dezzani to bring in the plaintiff's clients or to misappropriate any company information as a condition of her employment.").  Thus, even if the evidence permitted an inference that Bunnell and Marshall, with VNS's knowledge, solicited customers and shared confidential information – and it does not – ResCare's tortious interference claim must fail.

D. <u>Intentional Interference with Business Relations (Bunnell, Marshall & VNS)</u>

In count four, ResCare claims that defendants interfered with ResCare's business relationship with its clients – that is, Marshall and Bunnell's patients.  To prove this claim, ResCare must show that it had a business relationship; the defendant intentionally interfered with the relationship knowing of the relationship; and as a result of the interference, the plaintiff

suffered actual loss.  Hi-Ho Tower, Inc. v. Com Tronics, Inc.,
255 Conn. 20, 27 (2000).  On this claim, all three defendants are
entitled to summary judgment for reasons already discussed.
Marshall is entitled to summary judgment because there is no
admissible evidence she solicited patients.  Bunnell is entitled
to summary judgment because the only admissible evidence arguably
tending to show solicitation – his phone records – is
insufficient to support a finding of liability.  And VNS is
entitled to summary judgment because, in addition to the lack of
evidence that Marshall or Bunnell solicited patients, ResCare
cannot prove that VNS's conduct was tortious.

E. CUTPA

ResCare argues that VNS, Bunnell and Marshall violated CUTPA
by soliciting patients and using confidential information.  CUTPA
provides a cause of action against a person who engages in
"unfair methods of competition and unfair or deceptive acts or
practices in the conduct of any trade or commerce," Conn. Gen.
Stat. § 42-110b(a), provided the plaintiff has suffered an
"ascertainable loss of money or property, real or personal,"
Conn. Gen. Stat. § 110g(a).  Defendants argue that the CUTPA
claim fails because no reasonable juror could infer that the
alleged wrongful acts took place.  As discussed above, I agree,
except with regard to Marshall's solicitation of Tamika Miller.
The solicitation of Miller does not provide a basis for a CUTPA

claim because ResCare suffered no loss and the statute requires ascertainable loss of money or property.   See Hinchcliffe v. Amer. Motors Corp., 440 A.2d 810, 814 (Conn. 1981).

III.  Conclusion

Accordingly, VNS's motion for summary judgment, ECF No. 108, and Bunnell's motion for summary judgment, ECF No. 106, are hereby granted.  Marshall's motion for summary judgment, ECF No. 106, is also granted except with regard to her solicitation of Tamika Miller.  On that claim, Marshall is entitled to summary judgment on the issue of actual damages only.

So ordered this 22nd day of July, 2015.


_____
                     /s/
          Robert N. Chatigny
     United States District Judge